# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA A. SMITH-KOHLER,  :
                          :
        Plaintiff         :     No. 3:11-CV-01538
                          :
    vs.                   :     (Judge Nealon)
                          :
MICHAEL J. ASTRUE,        :
COMMISSIONER OF SOCIAL    :
SECURITY,                 :     **FILED**
                          :     **SCRANTON**
        Defendant         :

MAR 0 1 2013

## MEMORANDUM

PER _____

DEPUTY CLERK

## Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Patricia A. Smith-Kohler's claim for social security disability insurance benefits and supplemental security income benefits.

On March 14, 2008, Smith-Kohler protectively filed[1] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 20, 67-68 and 93-103.[2]  On July 9, 2008, the Bureau of Disability Determination[3]

---

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on October 18, 2011.

3.  The Bureau of Disability Determination is an agency of the

(continued...)

denied Smith-Kohler's applications. Tr. 20 and 70-79. On August 15, 2008, Smith-Kohler requested a hearing before an administrative law judge. Tr. 82-83. Approximately 13 months later, a hearing was held on September 18, 2009, before an administrative law judge. Tr. 37-66. On November 3, 2009, the administrative law judge issued a decision denying Smith-Kohler's applications. Tr. 20-29. On December 31, 2009, Smith-Kohler requested that the Appeals Council review the administrative law judge's decision. Tr. 15-16. After being granted several extension of times, Smith-Kohler submitted a brief to the Appeals Council on May 23, 2011. Tr. 158-163. On June 20, 2011, the Appeals Council concluded that there was no basis upon which to grant Smith-Kohler's request for review. Tr. 1-5. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Smith-Kohler then filed a complaint in this Court on August 19, 2011. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on April 6, 2012, when Smith-Kohler filed a reply brief.

---

3. (...continued)
state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 71 and 76.

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Smith-Kohler met the insured status requirements of the Social Security Act through December 31, 2011. Tr. 20, 22 and 118.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Smith-Kohler, who was born in the United States on March 16, 1971,[5] graduated from high school in 1989 and can read, write, speak and understand the English language and perform basic mathematical functions.[6] Tr. 42, 67-68, 93, 121, 131 and 136.

---

5. At the time of the administrative hearing and the administrative law judge's decision, Smith-Kohler was 38 years of age and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

6. Although Smith-Kohler testified at the administrative hearing that she had difficulty with simple math at times, in a document filed with the Social Security Administration she stated that she could count change. Tr. 43 and 136. She also claimed she had difficulty doing addition and subtraction in her head. Tr. 61.

3

During Smith-Kohler's elementary and secondary schooling, she attended regular education classes. Tr. 131. After high school, she completed in 1991 a program to become a certified nurse's assistant. Id.

Smith-Kohler has past relevant employment[7] as (1) an administrative assistant in the health care field which was described by a vocational expert as skilled, sedentary work as generally performed but medium work as actually performed by Smith-Kohler; (2) as a certified nurse's assistant which was described as semi-skilled, medium work as generally performed but very heavy work as actually performed by Smith-Kohler; and (3) as a receptionist/secretary in the medical field which was described as semi-skilled, sedentary work as generally performed but medium work as actually performed by Smith-Kohler.[8] Tr. 28, 63 and 123.

---

7. Past relevant employment in the present case means work performed by Smith-Kohler during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

8. The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(continued...)

Records of the Social Security Administration reveal that Smith-Kohler had earnings in the years 1988 through 2007. Tr. 114. Smith-Kohler's highest annual earnings were in 2003 ($28,109.63) and her lowest in 1988 ($1222.47). Id. Smith-Kohler's total earnings during those twenty years were $237,587.08. Id.

---

8.  (...continued)
    (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

    (c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

    (d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

    (e) *Very heavy work*. Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

Smith-Kohler claims that she became disabled on July 1,

2007, primarily because of surgery to correct a Chiari

malformation[9] and increased headaches in the aftermath of that

9. The National Institute of Health's website describes a Chiari malformation as follows:

> Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance. When the indented bony space at the lower rear of the skull is smaller than normal, the cerebellum and brainstem can be pushed downward. The resulting pressure on the cerebellum can block the flow of cerebrospinal fluid (the liquid that surrounds and protects the brain and spinal cord) and can cause a range of symptoms including dizziness, muscle weakness, numbness, vision problems, headache, and problems with balance and coordination. There are three primary types of CM. The most common is Type I, which may not cause symptoms and is often found by accident during an examination for another condition. Type II (also called Arnold-Chiari malformation) is usually accompanied by a myelomeningocele-a form of spina bifida that occurs when the spinal canal and backbone do not close before birth, causing the spinal cord to protrude through an opening in the back. This can cause partial or complete paralysis below the spinal opening. Type III is the most serious form of CM, and causes severe neurological defects. Other conditions sometimes associated with CM include hydrocephalus, syringomyelia, and spinal curvature.

See NINDS Chiari Malformation Information Page, http://www. ninds.nih.gov/disorders/chiari/chiari.htm (Last accessed February 20, 2013). "Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance. Normally the cerebellum and parts of the brain stem sit in an indented space at the lower rear of the skull, above the foramen magnum (a funnel-like opening to the spinal canal). When part of the cerebellum is located below the foramen magnum, it is called a Chiari malformation," NINDS Chiari Malformation Fact Sheet, http://www.ninds.nih.gov/disorders/chiari/detail_chiari.htm#19413 3087 (Last accessed February 20, 2013). The medical records which will be reviewed *infra* reveal that Smith-Kohler also suffered from a syringomyelia or syrinx which is "a [Cerebral
(continued...)

surgery. Tr. 44 and 122. At the administrative hearing, Smith-Kohler described her disabling impairment as follows:

> Q. . . . Tell me in your own words, what keeps you from working now?
>
> A. I just don't know what to do. You'll have to excuse me.
>
> \* \* \* \* \* \* \* \* \* \*
>
> A. First of all, I don't know who would hire a person who can't stay in no job and work, and stay there, who's going to call out because they can't, and I can't, the work.
>
> And, but at least 15 headaches a month. Some of them are consecutive. Some of them are one. It's just a skip a day or two. Some of them are bad.
>
> Q. Did those headaches pre-date the surgery?
>
> A. Yes.
>
> Q. I want you to describe your headaches for me, if you can. Where do they originate?
>
> A. They start, they're in the back of the head. And travel up through the front.

Tr. 44. Smith-Kohler also claimed that she had numbness in her left arm and hand,[10] left-sided weakness, tremors and problems

---

9. (...continued)
Spinal Fluid]-filled cyst . . . form[ed] within the spinal cord's canal. The growing syrinx destroys the center of the spinal cord, resulting in pain, weakness, and stiffness in the back, shoulders, arms or legs. Other symptoms may include headaches and loss of ability to feel extremes of hot or cold, especially in the hands. Some individuals also have severe arm and neck pain." Id.

10. The record reveals that Smith-Kohler is right handed. Tr.
(continued...)

concentrating and remembering instructions. Tr. 48 and 122. In one document filed with the Social Security Administration prior to the administrative hearing, Smith-Kohler claimed that she could not "sit, stand or walk for a long period of time." Tr. 122. However, in a second document when Smith-Kohler was given an opportunity to check items that her "illnesses, injuries, or conditions affect", she did not check the following: squatting, standing, walking, sitting, hearing, stair climbing, seeing, and getting along with others. Tr. 138. At the administrative hearing, Smith-Kohler stated that she had no current problems with seeing or hearing but that she has tremors "once in awhile." Tr. 51. She also claimed that she could not carry anything in her left hand, could not push or pull anything with her left hand, could not reach with her left arm above her head or shoulder, and that she had "not much" strength in her left arm. Tr. 60. Smith-Kohler has not worked since July 1, 2007. Tr. 122.

For the reasons set forth below, the Court will affirm the decision of the Commissioner denying Smith-Kohler's applications for disability insurance benefits and supplemental security income benefits.

**Standard of Review**

When considering a social security appeal, the Court has plenary review of all legal issues decided by the Commissioner.

---

10. (...continued)
138.

See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the Court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d

9

Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

Substantial evidence has been described as more than a mere

scintilla of evidence but less than a preponderance. Brown, 845

F.2d at 1213. In an adequately developed factual record

substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence."

Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all

the other evidence in the record," Cotter, 642 F.2d at 706, and

"must take into account whatever in the record fairly detracts from

its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488

(1971). A single piece of evidence is not substantial evidence if

the Commissioner ignores countervailing evidence or fails to

resolve a conflict created by the evidence. Mason, 994 F.2d at

1064. The Commissioner must indicate which evidence was accepted,

which evidence was rejected, and the reasons for rejecting certain

evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.

Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968,

970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d

Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in

substantial gainful activity,[11] (2) has an impairment that is
severe or a combination of impairments that is severe,[12] (3) has an
impairment or combination of impairments that meets or equals the
requirements of a listed impairment,[13] (4) has the residual

---

11. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."   20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

12.   The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two.  Id.  If a claimant
has any severe impairments, the evaluation process continues.   20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.   20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

13. If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
(continued...)

12

functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[14]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

13. (...continued)
impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

14. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

13

**Medical Records**

Before the Court addresses the administrative law judge's decision and the arguments of counsel, the Court will briefly review some of Smith-Kohler's medical records starting with a record from 2001 relating to her Chiari malformation and syrinx.

On October 13, 2000, Smith-Kohler had an MRI of the cervical spine performed at Northeastern Pennsylvania MRI Imaging Center. Tr. 175-176. The clinical history reported relating to this MRI was as follows: "The patient complains of chronic cervical and right shoulder pain with numbness in the right arm and hand,[15] with outside examination at Valley Open MRI demonstrating a cervicothoracic syrinx. The current clinical request [for this MRI] is to rule out associated tumor." Tr. 175. The impression of Jonathon O. Sullum, M.D., the physician interpreting the MRI was as follows: "1. Diffuse cervical syrinx extending from C1 to the edge of the field-of-view at T3. 2. The syrinx is associated with an Arnold Chiari I malformation[16] with marked elongation of the

---

15. After the surgery performed in July, 2007, Smith-Kohler complained of problems with her left upper extremity.

16. "Type 1 involves the extension of the cerebellar tonsils (the lower part of the cerebellum) into the foramen magnum, without involving the brain stem. Normally, only the spinal cord passes through this opening. Type 1 – which may not cause symptoms – is the most common form of CM and is usually first noticed in adolescence or adulthood, often by accident during an examination for another condition. Type 1 is the only type of CM
(continued...)

14

cerebellar tonsils. 3. If needed clinically, the inferior extent of the syrinx could be evaluated by MRI of the thoracic spine. 4. No evidence of mass lesion." Tr. 175-176.

The next records are a consultation report and operative report relating to a steroid injection of a nerve in the right shoulder from Dasa Satyam, M.D., dated January 26, 2001. Tr. 187-190. In the consultative report, Dr. Satyam stated in pertinent part as follows: "This is a pleasant 29 year old white female . . . seen in the office in the past for pain in the neck and shoulder area . . . The patient had an MRI done in the past which showed Arnold Chiari malformation in the spinal cord and the neurosurgeon had indicated that there is no need for surgery at this point." Tr. 187.

On March 19, 2007, Smith-Kohler visited the emergency department at Wyoming Valley Heath Care System, Wilkes-Barre, complaining of tremors. Tr. 255. A physical examination on March 19th revealed that Smith-Kohler's gait was normal and her speech and memory were normal. Tr. 256. She also had normal range of motion in the upper and lower extremities. Id. On March 20, 2007, the date of discharge from the emergency department, Smith-Kohler denied any difficulty with her speech or swallowing and denied an

16. (...continued)
that can be acquired." NINDS Chiari Malformation Fact Sheet, http://www.ninds.nih.gov/disorders/chiari/detail_chiari.htm#19413 3087 (Last accessed February 20, 2013).

15

"unsteady gait." Tr. 259. A physical examination on March 20th revealed normal motor strength (5/5) in her upper and lower extremities. Tr. 260. An MRI of the brain did not show any acute abnormality but revealed "an area of encephalomalacia"[17] and the Chiari 1 malformation. Id. The diagnostic impression was "entire body tremors of unclear etiology, possibly related to underlying anxiety or vitamin B12 deficiency" and "[h]eadaches, which could be related to Chiari malformation." Id. Smith-Kohler was prescribed medications and Vitamin B12 (cyanocobalamin) and was discharged. Tr. 249.

On May 15, 2007, Smith-Kohler had an appointment with Philip Hlavac, M.D., a neurologist. Tr. 298-299. At that appointment, Smith-Kohler complained of mild subocciptal headaches, occasional bouts of blurred vision and tremors. Tr. 298. A physical examination was essentially normal, including an intact gait and normal (5/5) strength "throughout." Id. Smith-Kohler did have a "slight decrease [in sensation to pinprick] in the right 5th digit compared to the left and she was "moderately obese in no apparent distress." Id. She had full range of motion of the neck. Id. Dr. Hlavac's impression was that Smith-Kohler had "a

_____

17. Encephalomalacia is defined as "softening of the brain, especially that caused by an infarct." Dorland's Illustrated Medical Dictionary, 612 (32nd Ed. 2012). An infarct is defined as "an area of coagulation necrosis in a tissue due to local ischemia resulting from obstruction of circulation to the area," in other words a stroke. Id. at 934.

16

relatively asymptomatic Chiari malformation" and the "syrinx [was] not asymptomatic at this time." Tr. 299. Dr. Hlavac ordered additional MRIs. Id.

On May 18, 2007, Smith-Kohler had an MRI of the cervical spine which revealed the Chiari malformation and a large syrinx in the cervical and thoracic spine. Tr. 284. On May 21, 2007, Smith-Kohler had an MRI of the lumbar spine which revealed "[m]ild diffusely bulge of the L5-S1 level with no associated neural foraminal narrowing or spinal stenosis." Tr. 280. On May 22, 2007, Smith-Kohler had an MRI of the thoracic spine which revealed a "[l]arge spinal cord syrinx extending from the cervical spine to the midthoracic spinal cord at the level of T6." Tr. 281.

On May 29, 2007, Smith-Kohler had an appointment with Dr. Hlavac. Tr. 296. A physical examination revealed that Smith-Kohler's strength was "good throughout" and her standard gait was not impaired. Id. However, tandem gait[18] resulted in "falling to one side or another." Id. Dr. Hlavac observed no ataxia, i.e., lack of muscle coordination. Id. Dr. Hlavac reviewed the recent MRIs and noted that "there is quite an extensive syrinx." Id. His recommendation was "surgical intervention for the Chiari" but because Smith-Kohler was a "close friend of [the] practice, [he noted he] would feel more comfortable that the treatment be

18. A tandem gait is where the toes of the back foot touch the heel of the front foot at each step.

rendered at an outside facility." Id. Dr. Hlavac referred Smith-
Kohler to Thomas Jefferson University Hospital for a surgical
consultation. Id. However, prior to that consultation Smith-
Kohler was seen by Scott M. Friedenberg, M.D., a neurologist at the
Geisinger Medical Center, Danville, Pennsylvania. Tr. 300-302.
After examining Smith-Kohler, Dr. Friedenberg agreed with the plan
to have Smith-Kohler evaluated at Thomas Jefferson University
Hospital. Tr. 301. His assessment was that her entire clinical
symptoms were attributable to the Chiari malformation. Id.

On June 20, 2007, Erol Veznedaroglu, M.D., an associate
professor of neurosurgery at Thomas Jefferson University Hospital
in Philadelphia examined Smith-Kohler. Tr. 443-444. A physical
examination revealed that Smith-Kohler had an unsteady gait but she
was "able to walk without obvious difficulty." Tr. 443. Dr.
Veznedaroglu recommended decompression surgery. Id. That surgery
was performed on July 3, 2007. Tr. 461-462. Smith-Kohler was
discharged from the hospital on July 8th but subsequently was
readmitted to medical facilities on at least two occasions. Tr.
398.

Dr. Veznedaroglu examined Smith-Kohler in early August
2007, and reported that Smith-Kohler had a "rocky postoperative
course" but that there was no infection and her incision was well-
healed. Tr. 441. After this appointment, Smith-Kohler again
underwent additional hospitalizations, including at Thomas

18

Jefferson University Hospital. Tr. 237 and 334. However, as of early October 2007, Smith-Kohler's condition had improved such that Dr. Veznedaroglu reported the following: a resolution of pain and spasms, full range of motion of the neck, resolution of upper extremity dysmetria,[19] and markedly improved balance. Tr. 439 and 494. Smith-Kohler's headaches and tremors had completely resolved, as well. Id.

In January 2008, Dr. Veznedaroglu reported that Smith-Kohler was "continuing to make great strides in her improvement." Tr. 492. While Smith-Kohler was starting to have "some recurrence of her headaches" the severity was "markedly decreased." Id. Her MRI showed a stable syrinx with complete resolution of the postoperative fluid collection and excellent decompression. Id. Dr. Veznedaroglu further noted, "we are making great strides to get her back to work." Id.

In April, 2008, Smith-Kohler reported to Dr. Veznedaroglu that she was currently looking to become employed in a secretarial position. Tr. 491. Dr. Veznedaroglu in response to that report stated that Smith-Kohler had "absolutely no

_____

19. Dysmetria is defined as "a condition in which there is improper estimation of distance in muscular acts, with disturbance of the power to control the range of muscular movement, often resulting in overreaching." Dorland's Illustrated Medical Dictionary, 578 (32nd Ed. 2012).

contraindications to do, although I would like her to avoid any heavy lifting." Id.

In July, 2008, Leo P. Potera, M.D., reviewed Smith-Kohler's medical records on behalf of the Bureau of Disability Determination and concluded that she had the ability to engage in a limited range of light work. Tr. 579-584. Dr. Potera found that Smith-Kohler could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand and/or walk 6 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday. Tr. 580. Dr. Potera noted that Smith-Kohler had limited use of her left upper extremity and other than climbing, ladders, ropes and scaffolds which she must avoid altogether, she could engage in the postural activities of balancing, stooping, kneeling, crouching, and climbing ramps and stairs on an occasional basis. Tr. 581. Smith-Kohler had limited fingering/feeling with the left hand; no visual limitations; no communicative limitations; and she had to avoid concentrated exposure to humidity, fumes, odors, dusts, gases and poor ventilation, and hazards such as heights and machinery. Tr. 581-582. In support of these assessed limitations, Dr. Potera summarized the medical evidence, including the fact that in April 2008, Dr. Veznedaroglu approved Smith-Kohler for a return to work, as long as it did not involve heavy lifting. Tr. 584.

In December 2008, a primary care physician's physical examination of Smith-Kohler revealed no abnormal findings. Tr. 654-

655. Smith-Kohler had an absolutely normal neurological examination. Tr. 655.

Neurology notes dated February 16, 2009, indicate that a medical provider discussed with Smith-Kohler medication overuse headaches. Tr. 856.

In March 2009, Smith-Kohler visited the emergency department of the Wyoming Valley Health Care System complaining of a severe migraine. Tr. 645-646. However, a physical examination was essentially normal. Tr. 646. Smith-Kohler did have tenderness in the neck and slight weakness in the left hand in fine motor skills only. Id.

On March 10, 2009, a primary care physician's physical examination of Smith-Kohler revealed no abnormal findings. Tr. 643-644. Smith-Kohler had an absolutely normal neurological examination. Tr. 644. Similar findings were made by a primary care physician on June 2 and July 14, 2009. Tr. 639-642.

A neurological examination on May 18, 2009, was essentially normal, including that Smith-Kohler had normal strength, bulk/tone, gait, coordination and reflexes. Tr. 855. It was specifically noted that she had a "good tandem" gait. Id. It was observed, however, that Smith-Kohler did have drooping of the right eyelid (right ptosis) and a problem with sensation in her left arm and leg. Id. Smith-Kohler's weight was 272 pounds. Id.

On May 12, 2009, Smith-Kohler came under the care of Teshamae Monteith, M.D., at the Jefferson Headache Center in Philadelphia. Tr. 881. Smith-Kohler reported a history of having daily headaches for many years, beginning at age 15. Id. In fact, Smith-Kohler stated that she had "life-long headaches" with surgery not affecting them. Id. The results of a physical examination were essentially normal, including that Smith-Kohler had normal range of motion and strength in the upper and lower extremities, normal tone, no tremor, and a normal gait. Tr. 885-886. Dr. Monteith's impression in relevant part was as follows: "38 y/o women with history of chronic daily headaches [approximately] 15 years, s/p surgery for chiari malformation. Headaches consistent with chronic migraine with possible medication overuse. History of stroke concerning, although no evidence of hypercoagulable state or secondary cause of headache." Tr. 886.

A neurological examination on August 17, 2009, was essentially normal, including that Smith-Kohler had normal strength, bulk/tone, gait, coordination and reflexes. Tr. 853. It was again observed that Smith-Kohler did have drooping of the right eyelid (right ptosis) and a problem with sensation in her left arm. Id. Smith-Kohler's weight was 272 pounds. Id.

On August 20, 2009, Smith-Kohler had a follow-up appointment with Michael J. Marmura, M.D., at the Jefferson Headache Center. Tr. 869-873. Significantly, in the report of

22

this appointment, it was noted that Smith-Kohler's headaches were not aggravated by physical activity and they did not cause avoidance of physical activity. Tr. 869. Also, they only caused a slight to moderate decrease in function. Id. The results of a physical examination were essentially normal, although it was noted that Smith-Kohler had moderate spasm/tenderness in the muscles of the neck and limited range of motion in the neck. Tr. 872. Smith-Kohler had a normal range of motion and strength in the upper and lower extremities, no tremor, and a normal gait; she was oriented to time, place and person; her memory of recent and remote events was intact; her speech was clear, fluent and she had no aphasia;[20] her fund of knowledge was appropriate; and she was not visibly depressed or agitated. Id.

In August 2009, it was noted that Smith-Kohler had no gait problems, no history of falling within the previous three months, and no use of a wheelchair or cane for ambulation. Tr. 777, 784, 793, 803 and 809.

Although Smith-Kohler routinely had subjective physical complaints, including complaints of headaches, generally, physical

_____

20. Aphasia is defined as "any of a large group language disorders involving defect or loss of the power of expression by speech, writing, or signs, or of comprehending spoken or written language, due to injury or disease of the brain[.]" Dorland's Illustrated Medical Dictionary, 115 (32nd Ed. 2012).

examination findings relating to range of motion, strength, tone, reflexes, coordination and gait were essentially normal.

Finally, the record does not contain a functional assessment from a treating or examining physician.

## Discussion

The administrative law judge, at step one of the sequential evaluation process, found that Smith-Kohler had not engaged in substantial gainful work activity since July 1, 2007, the alleged disability onset date. Tr. 22.

At step two of the sequential evaluation process, the administrative law judge found that Smith-Kohler had the following severe combination of impairments: "status post Chiari malformation surgery; dysthymic disorder; status post ischemic infarct of the left parietal lobe; obesity; and migraines[.]" Id.

At step three of the sequential evaluation process, the administrative law judge found that Smith-Kohler's impairments did not individually or in combination meet or equal a listed impairment. Tr. 23.

At step four of the sequential evaluation process, the administrative law judge found that Smith-Kohler could not perform her past relevant work but that she had the residual functional capacity to perform a limited range of unskilled, light work. Tr. 24-28. Specifically, the administrative law judge found that

24

Smith-Kohler could perform light work except she could not engage in any:

> pushing or pulling with the upper or lower extremities; no climbing; no fingering or feeling with the left hand; no exposure to pulmonary irritants such [as] dust, fumes, gases; no exposure to dangerous machinery or unprotected heights; and is further limited to simple, repetitive tasks which are low stress positions defined as only involving simple decision-making and judgment performed in a stable work environment.

Tr. 24. In setting this residual functional capacity, the administrative law judge found that Smith-Kohler's medically determinable impairments could reasonably be expected to cause her alleged symptoms but that her statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ability to perform a limited range of unskilled, light work. Tr. 25. The administrative law judge also relied on the opinion of Dr. Potera who found that Smith-Kohler could perform a limited range of light work. Tr. 27.

Based on the above residual functional capacity and the testimony of a vocational expert, the administrative law judge, at step five of the sequential evaluation process, found that Smith-Kohler could perform unskilled, light work as an usher, garment trimmer and tagger, and that there were a significant number of such jobs in northeastern Pennsylvania. Tr. 29 and 64-65.

The administrative record in this case is 889 pages in length, primarily consisting of medical and vocational records. Smith-Kohler basically argues that the administrative law judge erred by not adequately considering (1) evidence of the residual effects of a stroke suffered by her, (2) her headaches, and (3) her subjective complaints.

The Court has thoroughly reviewed the record in this case and finds no merit in Smith-Kohler's arguments. The administrative law judge did an excellent job of reviewing Smith-Kohler's vocational history and medical records in his decision. Tr. 20-29. Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 14, Brief of Defendant.

The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c). No treating or examining physician has indicated that Smith-Kohler suffers from physical or mental functional limitations that would preclude her from engaging in the limited range of light work set by the administrative law judge in his decision for the requisite

26

statutory 12 month period.[21]  No physician indicated that Smith-Kohler was incapable of working at that modest level on a full-time basis.  Moreover, the Court can not conclude, based on a review of the bare medical records, that Smith-Kohler is unable to engage in the limited range of work set by the administrative law judge (in fact it is not the Court's scope of review to do so in so far as the Court is limited to a substantial evidence review).

The administrative law judge relied on the opinion of Dr. Potera, the state agency physician.  The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

The Court is satisfied that the administrative law judge appropriately took into account all of Smith-Kohler's mental and physical limitations in the residual functional capacity assessment.

The administrative law judge stated that Smith-Kohler's statements concerning the intensity, persistence and limiting

---

21.  To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of light work. Tr. 16. The administrative law judge was not required to accept Smith-Kohler's claims regarding her physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Smith-Kohler testify, the administrative law judge is the one best suited to assess the credibility of Smith-Kohler.

The Court's review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed.

An appropriate order will be entered.

_____
**United States District Judge**

Dated: March 1, 2013